# In the United States Court of Federal Claims

No. 12-148C
(Filed Under Seal: April 30, 2012)
(Reissued for Publication: May 7, 2012)[*]

```
*************************************
CALIFORNIA INDUSTRIAL            *
FACILITIES RESOURCES, INC.,      *
                                 *
          Plaintiff,             *
                                 *
v.                               *    Delivery Order Protest, 10 U.S.C.
                                 *    § 2304c(e); Cross-Motions for Judgment on
THE UNITED STATES,               *    the Administrative Record; Scope of the
                                 *    Underlying Contracts; Language in
          Defendant,             *    Contracts Is Unambiguous; Resort to
                                 *    Extrinsic Evidence Is Unnecessary
and                              *
                                 *
ATLANTIC DIVING SUPPLY, INC.,    *
                                 *
          Defendant-Intervenor.  *
*************************************
```

Paul F. Khoury, Washington, DC, for plaintiff.

Joseph E. Ashman, United States Department of Justice, Washington, DC, for defendant.

Ronald K. Henry, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

In this preaward bid protest, plaintiff challenges a request for quotations ("RFQ"), and the proposed award of a delivery order arising from the RFQ, as exceeding the scope of the underlying indefinite-delivery, indefinite-quantity contracts. The parties have filed cross-motions for judgment on the administrative record. For the reasons set forth below, the court denies plaintiff's motion and grants defendant's and defendant-intervenor's motions.

---

[*] The court issued this Opinion and Order under seal on April 30, 2012. The parties subsequently informed the court that they have not identified any protected information that requires redaction.

## I. BACKGROUND

### A. Special Operational Equipment Tailored Vendor Logistics Support Program

Plaintiff is a manufacturer of shelter systems located in Monroe, Washington.[1]  AR 804. Its protest concerns the scope of four contracts issued by the Defense Supply Center Philadelphia ("DSCP"), part of the Defense Logistics Agency ("DLA").[2]  The DSCP's primary mission is to support the country's warfighters by providing them with the supplies and services they need, when and where they need them.  Id. at 350.  To further its mission, the DSCP established what is now called the Special Operational Equipment Tailored Logistics Support Program.  Id. at 45.

In August 2005, the DSCP awarded three contracts under the second generation of the program.  Id. at 7, 45.  Two years later, the DSCP determined that the program should be continued with "logistical enhancements and improvements" to, among other things, "provide support as the military services stand-up new organizations and support for changing operational missions."  Id. at 5-6; accord id. at 45.  Thus, in late 2007, it began to develop a plan for a follow-on acquisition.  Id. at 1-4.  In its acquisition plan, the DSCP indicated that its intent was to "supply customers and missions related to Special and Conventional Warfare" with special operational equipment identified on a Core List and spread among twenty-three categories.  Id. at 5-6, 8.  It anticipated that its customers for the follow-on acquisition would include the military services, the United States Department of Defense, other federal agencies, and state and local governments.  Id. at 5.  And, it contemplated that the missions would include those in the following areas: "Tactical and Survival, Homeland Security, Mobile Security, Coastal Warfare, Port Security, Aircrew Life Support, Flight Deck Applications, Explosive Ordnance Disposal, Diving and Salvage, Underwater Construction, Search and Rescue, Safety, Ships Husbandry, Hyperbaric, Enclosed Space Diving and Lifesaving."  Id.

The DSCP publicly announced its intent to issue a solicitation for the follow-on acquisition on December 12, 2007.  Id. at 27.  Consistent with the acquisition plan, it indicated that it sought vendors "for the Special Operational Equipment supplies . . . contracts" to supply the military services, federal agencies, and state and local governments.  Id. at 28.  In particular, the DSCP noted that the solicitation would "encompass a wide spectrum of special operational equipment," which could "be categorized in product classes and missions covering diving, hyperbarics, lifesaving, search and rescue, tactical, personal protection, flight and deck crew safety, maritime interdiction, homeland defense, and the global war on terrorism."  Id.

---

[1] The court derives the facts in the background section from the administrative record ("AR").  It did not derive any of the facts from, or otherwise consider, the exhibits attached to the complaint, as explained in its ruling on defendant's motion to strike, issued contemporaneously with this opinion.

[2] Effective July 2010, the DSCP was renamed DLA Troop Support.  AR 796.  For simplicity, the court refers to this entity throughout the opinion as the DSCP.

The DSCP issued solicitation SPM8EJ-08-R-0051 on April 30, 2008, for the follow-on acquisition. Id. at 34. Several sections in the solicitation addressed the scope of the work offerors would be expected to perform. In the Notice to Offerors section, the DSCP indicated that the Special Operational Equipment Tailored Logistics Support Program would be used to provide its customers with "a full line of logistic support of special operational equipment . . . ." Id. at 45; accord id. at 44 ("Proposals are being solicited for Special Operational Equipment Tailored Logistics Support Program contracts for logistical support . . . ."). In that same section, the DSCP's customers were repeatedly identified as including the military services, the United States Department of Defense, other federal agencies, and state and local governments. Id. at 44-45. And, in the sections of the solicitation describing the proposal requirements and evaluation factors, the DSCP indicated that offerors would be evaluated on their stated experience "in support of military and federal missions relating to diving operations, lifesaving/search and rescue operations, hyperbaric support, flight deck safety, maritime interdiction, tactical operations and homeland defense." Id. at 119, 132.

The solicitation's Statement of Work further reflected the DSCP's focus on the needs of its customers and their missions. In that section, the DSCP provided that the scope of work of the Special Operational Equipment Tailored Logistics Support Program involved "the total logistics support required to supply customers and missions" with special operational equipment included on a Core List and in twenty-three categories, including Survival Gear, Tactical Equipment Protective, Air Crew Support and Flight Deck Safety Items, and Survival Kits. Id. at 78-79. In addition, it indicated that the "primary concept" of the awarded contracts was "to support America's special operations community by providing all equipment . . . necessary to perform their missions." Id. at 78. Moreover, it identified the customers who would obtain the special operational equipment as including the military services, the United States Department of Defense, other federal agencies, and state and local governments. Id. at 79, 81. Finally, the DSCP provided an example of the type of delivery order it anticipated under the contracts: an order from an aircraft carrier for 2,500 vests. Id. at 86; see also id. at 152.5-.6 (containing a number of entries on the Core List for vests of various colors–both unadorned and with bladders, inflators, whistles, lights, and $CO_2$ cylinders).

The DSCP informed prospective offerors in the solicitation that it intended to award multiple indefinite-delivery, indefinite-quantity contracts. Id. at 44, 56, 78-79. Indeed, on January 9, 2009, it awarded contracts to defendant-intervenor and three other companies ("vendors").[3] Id. at 227, 258, 287, 318. All four contracts expressly incorporated the clauses and provisions of the solicitation described above. Id. at 229, 260, 289, 320.

On February 9, 2009, one month after awarding the contracts, the DSCP prepared a memorandum in support of its decision to include tents, shelters, and related accessories within the scope of the contracts. Id. at 346-47. Specifically, it concluded:

---

[3] The contract numbers for these contracts are SPM8EJ-09-D-0001, SPM8EJ-09-D-0002, SPM8EJ-09-D-0003, and SPM8EJ-09-D-0004. AR 227, 258, 287, 318.

> Mobile shelters of this type are used for various application[s] including base camps and command and control applications. Under the Special Operational Equipment Prime Vendor program and related contracts, the focus is to support the mission of the Special Operations community, wherever that mission may take them. Mobile command and control shelters and mobile base camp shelters directly support the ever changing missions of the Special Operations community. The rapid assembly tents and shelters, trailers used to store and move the disassembled product, and the necessary accessories to make the shelters useful (such as lighting and environmental control) . . . fall within the general categories of Survival Gear, Tactical Equipment Protective, and Survival Kits under the scope of work contained in contracts 0001 through 0004. These items directly support the Special Operations community by allowing them to quickly erect shelters in the field for various uses, disassembled [sic] when the mission is complete, and move them to a new location to support the next mission. As such, these types of items are determined to be within scope and are supportable under the Special Operational Equipment Prime Vendor program.

Id. at 347. The DSCP amended the four contracts on April 6, 2009, to incorporate a previously separate program for the procurement of tents. Id. at 241, 284, 312, 343; accord id. at 807 ("DSCP reviewed the troop support strategy for commercial shelters and decided to transfer the program . . . . The decision was made to use the Special Operational Equipment Tailored Logistics Support Program . . . to procure commercial tent requirements that are high priority or for deploying troops.").

### B. Tent and Shelter Delivery Orders

After the DSCP determined that the contracts allowed for the procurement of tents, it began to issue RFQs and delivery orders for that purpose. For example, on May 24, 2010, it issued RFQ 20100524063503 to obtain quotations for the delivery of tents manufactured by plaintiff; a delivery order was issued to defendant-intervenor on June 11, 2010. Id. at 798. And, on July 20, 2010, it issued RFQ 20100720142114 to obtain quotations for the delivery of tents manufactured by Alaska Structures; a delivery order was again issued to defendant-intervenor on July 23, 2010. Id. at 796. Plaintiff filed a protest of this latter delivery order with the Government Accountability Office ("GAO") on July 29, 2010, arguing that it was outside the scope of defendant-intervenor's Special Operational Equipment Tailored Logistics Support Program contract. Id. at 796, 884. Plaintiff later amended its protest to include a similar challenge to four RFQs that the DSCP issued on September 1, 2010. Id. at 884. Both the delivery order and the RFQs were for tents and accessories ordered by United States Forces in Afghanistan to (1) support an "expected surge of 30,000 personnel," (2) be distributed to "smaller contingents of troops at forward operating bases and combat outposts," and (3) be used for "surgical facilities, medical supply warehouses, work spaces, and housing soldiers." Id. at 886.

The GAO denied plaintiff's protest on November 5, 2010. Id. at 884-88. Noting that the "primary purpose of the contract [was] to provide all equipment necessary for special operations forces to perform their missions" and that tents were "within the broad types of survival gear and logistical and tactical equipment envisioned" by the contract because they would be "used for, among other things, basic shelter for troops deployed in harsh environments, forward operating bases, and combat outposts," it concluded that the delivery order and the RFQs were "within the broad scope" of the contract. Id. at 884, 887-88. In other words, according to the GAO, "potential offerors would reasonably have anticipated that the . . . contract could require contractors to provide tents and related accessories necessary for special operations forces to accomplish their mission." Id. at 888.

### C. Proposed Tent and Shelter Tailored Logistics Support Program

While the DSCP was procuring tents via the Special Operational Equipment Tailored Logistics Support Program, it was developing a plan to procure tents through a separate contract vehicle. In August 2009, it prepared an acquisition plan in anticipation of establishing a Tent and Shelter Tailored Logistics Support Program to provide its customers and missions with "tents and shelters that [were] readily deployable, mobile, and capable of relatively quick assembly and take down." Id. at 776-95. More specifically, the DSCP sought to procure "a variety of commercial type tent and shelter products and related accessories, including, but not limited to lighting equipment and combination storage/power generation/environmental control trail[e]rs." Id. at 777. The tent and shelter products would be used as, among other things, "Warehouse Units," "Housing/Billeting Units," and "Mobile Medical Hospitals." Id. at 777-78.

According to the acquisition plan, the DSCP intended to issue the solicitation on October 16, 2009, and award the contract or contracts in March 2010. Id. at 794. In the meantime, for the approximately twelve months following the preparation of the acquisition plan, the DSCP intended to supply tents and shelters through the Special Operational Equipment Tailored Logistics Support Program. Id. at 778.

The DSCP eventually issued solicitation SPM8EJ-10-R-0004 for the acquisition of tents, shelters, and related accessories on April 30, 2010. Id. at 894, 900. It amended the solicitation on two occasions in response to protests lodged by plaintiff at the GAO. Id. at 969; accord id. at 775 (indicating that the acquisition plan had been revised in response to comments from legal counsel, the contract review division, and an acquisition review board). In a revised acquisition plan approved on November 18, 2010, the DSCP indicated its intent to award the contract or contracts in November or December 2010, and use the Special Operational Equipment Tailored Logistics Support Program to supply tents and shelters in the meantime. Id. at 756, 773. However, plaintiff lodged a third protest with the GAO regarding the solicitation on December 13, 2010. Id. at 969. In a March 21, 2011 decision, the GAO agreed with plaintiff that the DSCP's "approach of requiring offerors to submit prices for a list of particular brand name items–without also including salient characteristics to allow firms to propose equivalent products"–violated the full and open competition requirement of the Competition in Contracting

Act ("CICA"). Id. at 894-99. The GAO therefore recommended that the DSCP either "prepare an adequately written solicitation" that allowed for full and open competition or execute a justification and approval supporting its decision not to conduct the procurement using full and open competition. Id. at 899. The DSCP did not take either recommended action and instead, on May 19, 2011, cancelled the solicitation.[4] Id. at 900.

### D. The Challenged Request for Quotations

After the cancellation of the tents and shelters solicitation, the United States Army ("Army"), in September 2011, requested funding to purchase 496 environmental control units ("ECUs"), id. at 370-96, which are used to provide heating, cooling, and ventilation for tents and shelters, see, e.g., id. at 975, 981. Thereafter, on November 10, 2011, the DSCP issued RFQ 20111110008607 to obtain pricing and delivery information for the requested ECUs from the vendors in the Special Operational Equipment Tailored Logistics Support Program. Id. at 397-404. In the RFQ, the DSCP identified the manufacturer–HDT Tactical Systems–and model numbers of the ECUs it sought to procure, and informed the vendors that substitutions would not be considered. Id. at 401. It also designated Letterkenny Army Depot in Chambersburg, Pennsylvania as the delivery destination. Id. at 402. All four vendors responded to the RFQ by November 15, 2011. Id. at 405-28.

Plaintiff learned of the existence of the RFQ and, on November 15, 2011, filed a protest with the GAO. Id. at 968-74. It advanced two arguments in support of its protest. First, it contended that the RFQ was outside the scope of the Special Operational Equipment Tailored Logistics Support Program contracts because the DSCP was not attempting to procure equipment to support special operations missions. Id. at 968, 971. It based this contention on the fact that the ECUs would be delivered stateside to Letterkenny Army Depot rather than to Afghanistan, as well as on the GAO's statements in its November 5, 2010 decision that the scope of the contracts was limited to tents and accessories "necessary for special operations forces to accomplish their mission." Id. Second, plaintiff contended that the DSCP was using the RFQ to circumvent the GAO's March 21, 2011 ruling that "requiring offerors to submit prices for a list of particular brand name items–without also including salient characteristics to allow firms to propose equivalent products" violated CICA's full and open competition requirement. Id. at 968, 972.

Because plaintiff's protest reflected that it was not fully aware of the intended use of the requested ECUs, the DSCP, via letter dated November 30, 2011, provided plaintiff and the GAO with a memorandum prepared by the Army in response to the protest explaining how the ECUs

---

[4] The DSCP later indicated that the "responsibility for development of an acquisition strategy for a solicitation covering a full line of commercial tent and shelter related items was transferred" from one of its directorates to another and that the latter directorate was in the process of developing an acquisition plan and solicitation. AR 1006.

were to be used.[5]  Id. at 975-76.  In its response to this letter, plaintiff noted that although the DSCP clarified that the ECUs would eventually be deployed to Afghanistan, the Army's memorandum did not specifically address whether the ECUs would be used in support of special operations missions.  Id. at 978.

The DSCP submitted its agency report to the GAO on December 14, 2011, urging the GAO to deny the protest and appending another memorandum from the Army addressing the scope of the ECU procurement, this time in more detail.[6]  Id. at 981-96.  Plaintiff submitted its comments on the agency report to the GAO, id. at 997-1003, the DSCP responded to those comments, id. at 1004-07, and plaintiff submitted a reply, id. at 1008-12.

On February 22, 2012, the GAO denied plaintiff's protest.  Id. at 1013-18.  First, it found that the end users of the acquisition being challenged by plaintiff were indistinguishable from the end users of the acquisition that was the subject of its November 4, 2010 decision; both acquisitions were for troops in Afghanistan and use of the equipment was not limited to "special operations forces to accomplish their mission."  Id. at 1015-16.  Second, and from its point of view, more importantly, the GAO found that the Special Operational Equipment Tailored Logistics Support Program contracts expressly indicated that the DSCP intended to procure special operational equipment, but did not limit the potential customers for the equipment to special operations forces or limit the use of the equipment to special operations missions.  Id. at 1016-18.  Rather, it held, the contracts indicated that the equipment might be used by a wide range of DSCP customers for a wide range of missions.  Id. at 1017-18.  The GAO accordingly found no merit in plaintiff's protest.  Id. at 1018.

Unsuccessful before the GAO, plaintiff filed suit in the United States Court of Federal Claims ("Court of Federal Claims") on March 5, 2012.  In its complaint, plaintiff asserts one protest count: that RFQ 20111110008607 is outside the scope of the Special Operational Equipment Tailored Logistics Support Program contracts because it is not an acquisition of equipment to support special operations missions.[7]  Compl. ¶¶ 22-29.  It seeks a declaration that

---

[5]  The letter and memorandum were prepared in response to the protest and were not part of the record before the DSCP when it issued the challenged RFQ.  Because the court's review of an agency's decision must be based on the administrative record that was before the agency at the time it made its decision, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), the court will not consider the contents of the letter and memorandum when determining whether the DSCP's issuance of the RFQ was proper.

[6]  Because the memorandum was not part of the record before the DSCP when it issued the challenged RFQ, the court will not consider its contents.  See supra note 5.

[7]  In its combined reply in support of its motion for judgment on the administrative record and response to the cross-motions for judgment on the administrative record, plaintiff argues that the ECUs requested by the Army are beyond the scope of the underlying contracts.  This

the issuance of the RFQ was unreasonable, arbitrary, capricious, an abuse of discretion, or unlawful; rescission of the RFQ; and the issuance of a solicitation for a competitive procurement of the ECUs.  Id. at 8.  The parties filed cross-motions for judgment on the administrative record, and the court heard argument on April 30, 2012.

## II. DISCUSSION

### A. The Court Possesses Jurisdiction to Entertain Plaintiff's Protest

The Court of Federal Claims possesses jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2006).  Specifically, the Tucker Act provides that the Court of Federal Claims

> shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

Id. § 1491(b)(1).  Moreover, the court is authorized to entertain protests "in connection with the issuance or proposed issuance of a task or delivery order" if the protest is based "on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued[.]" 10 U.S.C. § 2304c(e)(1)(A) (2006 & Supp. IV).  Such protests are permitted because delivery orders that are beyond the scope of the underlying contract violate "the statutory

---

argument is contrary to the allegations set forth in its complaint, in which it contends only that the tents, shelters, and related accessories ordered under the Special Operational Equipment Tailored Logistics Support Program contracts must be used to support special operations missions, and not that such items could not be ordered under the contracts.  Therefore, the argument is a new claim.  However, a new claim may not be asserted in a brief.  Rather, the proper course of action would have been for plaintiff to seek leave to amend its complaint to add the new claim.  Plaintiff has not done so here, and thus the court declines to consider the claim. See Crawford v. United States, 376 F.2d 266, 276 (Ct. Cl. 1967) ("Inasmuch as this claim was not pleaded in the petition . . . nor was an amendment sought . . . , it is not properly before the court at this time and cannot be considered."); see also Redland Co. v. United States, 97 Fed. Cl. 736, 756 (2011) ("Because plaintiff only raises this claim in its motion for summary judgment, the court will not consider it . . . .").  Moreover, to the extent that plaintiff is not attempting to assert a new claim but is instead merely advancing an argument, that argument is waived. Plaintiff's undeveloped assertion in its motion for judgment on the administrative record that ECUs are not special operational equipment does not properly raise an argument.  See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 n.9 (Fed. Cir. 2006) ("[T]his court . . . has discretion to consider arguments that are not properly raised in the opening brief.").

requirement for full and open competition set forth in the [CICA], absent a valid determination that the work is appropriate for procurement on a sole-source basis or with limited competition." DynCorp Int'l LLC, B-402349, 2010 CPD ¶ 59 (Comp. Gen. Mar. 15, 2010).

Here, plaintiff objects to an RFQ for ECUs and the proposed issuance of a delivery order resulting from the RFQ as beyond the scope of the underlying contracts,[8] an objection that falls squarely within the court's bid protest jurisdiction. Moreover, there is no suggestion that plaintiff, a manufacturer of shelter systems, is not an interested party. Accordingly, the court may address the merits of plaintiff's protest.

### B. The Challenged Request for Quotations Does Not Exceed the Scope of the Underlying Contracts

As noted above, the parties have cross-moved for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)[9]). Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." Bannum, Inc., 404 F.3d at 1356.

In bid protests, the Court of Federal Claims reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Here, plaintiff claims that the DSCP violated law and regulation by issuing an RFQ that was beyond the scope of the underlying contracts. To prevail on its claims, plaintiff must show that the violation was "clear and prejudicial." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1333 (internal quotation marks omitted).

---

[8] There is no evidence in the record suggesting that the DSCP has issued a delivery order based on the quotations it received from the vendors.

[9] The decision in Bannum was based upon then-RCFC 56.1, which was abrogated and replaced by RCFC 52.1. RCFC 52.1 was designed to incorporate the decision in Bannum. See RCFC 52.1, Rules Committee Note (June 20, 2006).

To determine whether an RFQ and the delivery order that would follow from the RFQ exceed the scope of an underlying contract, the court adopts the analysis articulated by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in AT&T Communications, Inc. v. Wiltel, Inc., 1 F.3d 1201 (Fed. Cir. 1993), a decision that addresses whether a contract modification exceeds the scope of the underlying contract.[10] The Federal Circuit explained that a "modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause." Id. at 1205. Therefore, to determine the propriety of a contract modification, a court should examine "whether the contract as modified materially departs from the scope of the original procurement." Id. Applying this standard in a delivery order protest, the court must determine whether the delivery order proposed or issued by the agency materially departs from the scope of the underlying contract, such that potential offerors in the original procurement would not have anticipated that the agency would issue delivery orders of that nature under the contract.

Accordingly, the court must first ascertain the scope of the Special Operational Equipment Tailored Logistics Support Program contracts. Plaintiff contends that the only items that the DSCP could acquire under these contracts were those that would be used in support of special operations missions. Defendant and defendant-intervenor argue that the contract was broader and covered special operations equipment sought by all of the DSCP's customers for all of the DSCP's customers' missions.

The language in the contracts is not as narrow as plaintiff asserts. In the solicitation, which was incorporated into the contracts, the DSCP made three broad representations. First, it indicated that it would use the contracts to acquire special operational equipment. See AR 45 (noting that the Special Operational Equipment Tailored Logistics Support Program contracts would be used to provide "a full line of logistic support of special operational equipment"), 78 (noting that "the scope of work" involved "the total logistics support" related to twenty-three categories of equipment). Second, the DSCP indicated that it would acquire special operational equipment for its customers, repeatedly identifying those customers as including the military and federal, state, and local governments. See id. at 44-45, 79, 81. And third, the DSCP indicated that it would acquire special operational equipment to support its customers' missions. See id. at 78 (noting that "the scope of work" involved "the total logistics support required to supply customers and missions"), 119 (directing offerors to describe their experience "in support of military and federal missions relating to diving operations, lifesaving/search and rescue operations, hyperbaric support, flight deck safety, maritime interdiction, tactical operations and homeland defense"). Based on these representations, it appears that the DSCP intended to use the Special Operational Equipment Tailored Logistics Support Program to supply its customers and their missions with special operational equipment, without regard to whether those customers were special operations forces or whether the missions were special operations missions. In other words, the focus was on the nature of the equipment.

---

[10] The GAO adopts the same analysis to determine whether a task or delivery order exceeds the scope of the underlying contract. See DynCorp Int'l LLC, 2010 CPD at ¶ 59.

This interpretation is buttressed by the delivery order example provided by the DSCP in the solicitation's Statement of Work: 2,500 vests for an aircraft carrier. The vests, which presumably would be worn by personnel on an aircraft carrier's flight deck, fall under the Crew Support and Flight Deck Safety Items category set forth in the contracts. However, it would defy common sense to contend that the vests would be used solely in support of special operations missions. There can be no doubt that aircraft carriers are not used solely for special operations missions and that all personnel on an aircraft carrier are not special operations forces. Thus, some or all of the vests would be used during conventional military operations. Therefore, as this example demonstrates, the DSCP anticipated that the special operational equipment described in the contract could and would be used for purposes other than in support of special operations missions.

Plaintiff rests its narrower interpretation of the contracts on one sentence in the solicitation's Statement of Work: "The primary concept of this contract is to support America's special operations community by providing all equipment . . . necessary to perform their missions."[11] Id. at 78. The court is not persuaded that this one sentence limits the other language in the contracts describing the contracts' scope of work. As an initial matter, the sentence describes the "primary concept" of the contracts, but in no way prevents the DSCP from using

---

[11] Plaintiff also suggests that the GAO, in its November 5, 2010 decision, conclusively held that the Special Operational Equipment Tailored Logistics Support Program contracts were to be used to support special operations missions. See AR 887-88 ("The stated primary purpose of the contract is to provide all equipment necessary for special operations forces to perform their missions."), 888 ("[P]otential offerors would reasonably have anticipated that the . . . contract could require contractors to provide tents and related accessories necessary for special operations forces to accomplish their mission."). Plaintiff's suggestion lacks merit for several reasons. First, the GAO did not expressly hold that the contracts were limited to supplying equipment to support special operations missions; it merely repeated the "stated primary purpose" of the contracts and noted that a prospective offeror should have anticipated that the contracts would be used to supply tents and accessories to "special operations forces to accomplish their mission." See id. In other words, the GAO did not declare that the contracts could not be used to supply other customers or missions. Second, although they may be instructive, the decisions of the GAO are not binding on the Court of Federal Claims. Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011); Cutright v. United States, 953 F.2d 619, 622 n.* (Fed. Cir. 1992). Third, and most importantly, when engaging in contract interpretation, the court is obligated to look first at the plain language of the contract, which, if clear, renders further analysis unnecessary. See TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions."). Thus, even if the court accepted plaintiff's argument that the GAO had expressly held that the contracts were limited to supplying equipment to support special operations missions, the GAO's interpretation of the contract could not overcome the contract's plain language, which the court discusses below.

the contracts to support other customers and their missions.  "Primary" does not mean "only."  Moreover, this is the only sentence in the contracts that suggests that the DSCP would supply special operational equipment only to special operations forces in support of their missions.  To use this one sentence to limit the predominant and oft-repeated language in the contracts that describes a broader scope of work would render that broader language meaningless, contrary to the admonition that courts should interpret a contract to give meaning to all of its terms.  See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

Based on the unambiguous language of the Special Operational Equipment Tailored Logistics Support Program contracts, the court concludes that the scope of those contracts is, concisely stated, the provision of special operational equipment in support of all of the DSCP's customers and their missions.  Because the contracts' language is unambiguous, the court may not look to extrinsic evidence to interpret their provisions.  TEG-Paradigm Envtl., Inc., 465 F.3d at 1338.  Thus, plaintiff's reliance on other documents in support of its interpretation of the contracts–such as the DSCP's February 2009 scope memorandum,[12] documents related to the proposed Tent and Shelter Tailored Logistics Support Program, and government publications concerning special operations–is misplaced.

Because the Special Operational Equipment Tailored Logistics Support Program contracts are broad in scope, it necessarily follows that the delivery orders issued under those contracts may be similarly broad in scope.  See AT&T Commc'ns, Inc., 1 F.3d at 1205 ("[A] broad original competition may validate a broader range of later modifications without bid procedures.").  The challenged RFQ describes an acquisition by a military service–the Army–of items–ECUs–that fall within one or more of the categories set forth in the contracts–Survival Gear, Tactical Equipment Protective, and Survival Kits.  In other words, the DSCP is ordering special operational equipment for one of its customers.  Thus, the RFQ does not materially depart from the underlying contracts.  Moreover, prospective offerors in the original competition were on notice, from both the public announcement of the follow-on acquisition and the solicitation itself, that the DSCP intended to use the contracts to procure special operational equipment for all of its customers and their missions.  Accordingly, the RFQ is within the scope of the underlying contracts.

### III.  CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiff's motion for judgment on the administrative record, **GRANTS** defendant's motion for judgment on the administrative record, **GRANTS** defendant-intervenor's motion for judgment on the administrative record, and

---

[12] It bears noting that the DSCP's February 2009 scope memorandum merely addressed whether tents, shelters, and related accessories could be acquired under the contracts, and did not purport to limit the contracts in any way.

**DISMISSES** plaintiff's protest with prejudice.  No costs.  The clerk shall enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine proposed redactions agreeable to all parties.  Then, by **no later than Friday, May 11, 2012**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

                                             s/ Margaret M. Sweeney
                                             MARGARET M. SWEENEY
                                             Judge